IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOHN R. KING,

                Plaintiff,                        OPINION AND ORDER

v.

                                                 16-cv-144-wmc

DEPUTY ROBERT SPEARS, DEPUTY
BRANT FOLTMAN, DEPUTY DAVID
WALKER, BRANDI ANDERSON,
SYDNEY BRYANT, and KYLE MCNALLY,

                Defendants.

*Pro se* plaintiff John R. King is proceeding in this civil action on Fourteenth Amendment claims against Dane County Sheriff Officers Robert Spears, Brant Foltman, David Walker, Brandi Anderson, Sydney Bryant and Kyle McNally for allegedly entering his cell and assaulting him on December 30, 2015. Currently before the court is defendants' motion for summary judgment. (Dkt. #45.) Because the audio and video footage of this incident removes virtually all material disputes as to what actually occurred during this cell extraction, the court finds that a reasonable finder of fact would have to conclude that defendants' actions were objectively reasonable. Accordingly, the court will grant defendants' motion and enter judgment in their favor.

UNDISPUTED FACTS[1]

I.       **Parties**

As of December 30, 2015, John King was being held at the Dane County Jail. At

---

[1] Unless otherwise noted, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of facts and the evidence of record cited below, while viewing that evidence in a light most favorable to plaintiff as the non-moving party.

1

the time, defendant Kyle McNally was a Sergeant and defendants Robert Spears, Brant Foltman, Derrick Walker, Brandi Anderson, and Sydney Bryant were working as Sheriff's Deputies at the Jail.

## II. Dane County Jail Policies and Procedures

At booking, Dane County Jail inmates all receive an Inmate Handbook ("Handbook"), which outlines the jail's policies and procedures. Among other things, the Handbook directs inmates to be aware of the "Rules of the Jail," including the requirement that inmates obey all rules and follow all staff directions. Those Rules explicitly prohibit inmates from fighting, acting in a disorderly manner, and threatening to harm jail staff or other inmates. Inmates also must cooperate with staff when being transferred within the jail, and they may not deface or damage items in their cells. Finally, the rules prohibit inmates from obstructing the view into their cells.

Under certain circumstances, Dane County Jail Policy 604.04 provides that staff may enter cells and extract inmates, including when necessary for self-defense or the defense of others, "prevention of self-harm, prevention of escape, to change the location of a prisoner, or prevention of destruction of property." (Def. Ex. 4 (dkt. #46-4).) Dane County Jail deputies receive training on cell entries and extractions. To initiate a cell entry or extraction, a deputy must first obtain authorization from a supervisor, and the supervisor must remain present during the deployment of the team. When available, the entry team consists of: (1) entry person one, (2) entry person two, (3) team leader, (4) handcuff deputy, (5) equipment deputy and (6) video camera operator. With the

2

exception of the video camera operator, each member of the entry team must wear a protective vest, jumpsuit, elbow pads, kneepads, helmet and a gas mask.

Before conducting a cell entry, Policy 604.04 also provides that the team leader must conduct a negotiation with the inmate, providing specific and direct instructions. If the inmate persists in failing to comply with verbal instructions, then the team may conduct a cell entry.

### III. King's History at the Dane County Jail Prior to December 30, 2015

King is 6'3" and weighs approximately 215 pounds. Since 2000, he has been incarcerated at the Dane County Jail on multiple occasions, the most recent time before this incident began on June 22, 2015, after King had been arrested for a number of charges related to domestic abuse.[2] *See State v. King*, Case No. 2015CF1305 (Dane Cty. filed June 26, 2015), *available at* https://wcca.wicourts.gov (last visited Jan. 2, 2019). At that time, King also had fraud and forgery charges pending against him in another criminal matter in Outagamie County. *See State v. King*, Case No. 2015CF0007 (filed Jan. 5, 2015), *available at* https://wcca.wicourts.gov (last visited Jan. 15, 2019).

Beyond his criminal charges, King had already been involved in an altercation with Dane County Jail Deputies in October of 2015, which resulted in staff tasing and placing him in a restraint chair. That altercation also led to King being charged with battery to

---

[2] King maintains that his stature and history at the Dane County Jail are not relevant to his claims in this lawsuit, but he is mistaken. As explained in greater detail below, this court must consider all of the information about King known to defendants at the time of the altercation. *See Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018).

3

law enforcement officers and resisting an officer, both as a repeat offender, on December 22, 2015, just days before the incident at issue in this case. *See State v. King*, Case No. 2015CF2740 (Dane Cty. filed Dec. 22, 2015), *available at* https://wcca.wicourts.gov (last visited Jan. 15, 2019).

**IV.    December 30, 2015, Cell Extraction**

On December 30, 2015, King was being held at the jail in an administrative confinement cellblock used to house inmates with behavioral issues or other problems that make general population inappropriate. That same day, another inmate in King's cellblock, Sydney Coleman, was to be transferred to a disciplinary cellblock after he allegedly committed several rule violations and caused a disturbance, including threatening Deputy Foltman. When Coleman refused to follow instructions related to his transfer, multiple deputies came to the cellblock to assist.

As fate would have it, King's cell was next to Coleman's, and as the deputies attempted to transfer Coleman, King became agitated and started speaking loudly directly to the deputies, eventually yelling profanities at them and barricading his cell door with his mattress. King agrees that these actions violated jail policies but insists that he did so "to protect his well-being."

From defendants' perspective, King's involvement only worsened Coleman's disturbance by agitating him. As a result, the deputies decided that King should be moved to another cell as well. At that point, King requested that a camera be brought into the cell block before he would consider complying with any order of the deputies. Deputy

4

Foltman then left the cellblock to request a cell extraction team, which Sergeant McNally approved. More specifically, McNally agreed that King should be moved to a disciplinary cell with a solid door, based on King's disruptive and potentially violent behavior, and the fact that the cellblock doors are made of steel bars.[3]

Accordingly, multiple deputies met in the equipment room to be briefed about King and to plan the cell extraction. During the meeting, King's history of fighting with deputies was discussed. Therefore, defendants decided that Oleoresin Capsicum ("OC") spray would first be deployed to try to gain King's compliance before the deputies entered the cell. The team also decided to have one deputy record the events using a jail-issued GoPro video camera.

When the cell extraction team returned to the cellblock, they confirmed that King had barricaded his cell bars using his mattress. Despite the deputies ordering King to lay down in his cell, he refused. Then Deputy Walker approached the blocked cell door, and he specifically warned King that "if you do not lay down, I will spray you with OC spray." (Elve Aff., Ex. 2 (dkt. #46-2) 10; *see also* Walker Aff. (dkt. #50) ¶ 5.)[4] At that point, King

---

[3] While King disputes whether his behavior was actually disruptive up to this point, it is undisputed (and the subsequent video would seem to confirm) that King had covered his cell door with his mattress and tied a shirt around his face, and McNally was advised that King was threatening violence towards the deputies. (McNally Aff. (dkt. #51) ¶¶ 6-7.)

[4] Following the incident, the officers also wrote reports recounting their experiences. Defendants cite to both their own affidavits and the reports they prepared after this incident summarizing the events, but those reports largely consist of inadmissible hearsay when offered by defendants, so the court has not considered them for purposes of summary judgment. Defendants point out that King stated in his deposition that the reports appear accurate, but he now asserts that they are not. In light of King's *pro se* status, and because King now objects to the content of those reports, the court will not deem his blanket admission in his deposition to waive possible objections to the self-serving statements by defendants in those reports. Nonetheless, where King does not dispute the proposed factual findings premised on these reports, the court has included them.

5

had wrapped a shirt around both his face (to block the spray), and around his rib cage (to protect him from bodily harm). In response to Walker's directive, King also responded "spray that shit," while pressing the mattress against his cell door. Walker then deployed the OC spray in a small opening between the cell bars and the mattress at the top of King's cell. King tried to block the spray using his mattress, and he then tried to grab the OC canister from Walker.

During his deposition, even King acknowledged that an observer would say that he was resisting the deputies' orders at that point. (King Dep. (dkt. #53) at 117.) King further described his wrapping the shirt around his waist as preparing his body for "combat." (*Id.* at 94.) Finally, King testified that the mattress and shirt around his face accomplished exactly what he wanted, which was to avoid the effects of the OC spray. (*Id.* at 98-99.)

Given the ineffectiveness of the OC spray, the cell extraction team then returned to the equipment room and put on cell entry gear. During this time, approximately 11 minutes, the GoPro footage continued uninterrupted with King repeatedly claiming that he has done nothing wrong, predicting the cell extraction team would return "6 or 7 deep," and stating that he would not resist, while still holding his shirt around his face and blocking the cell door with his mattress in violation of policy. When the extraction team returned, King continued to complain, but eventually moved away from the bars of his cell and reluctantly lay down on his bed, although on his stomach with his hands and arms at his sides in a position from which he could spring, rather than lying on his back as directed.

6

At that point, the GoPro footage shows that five of the defendants, each wearing a numbered helmet, entered the cell in the following order: Walker (wearing helmet #9); Foltman (#11), Bryant (#10), Anderson (#7) and Spears (#15). The GoPro operator followed last. According to defendants, the GoPro footage shows that between 0:04 and 0:07, King pushed himself up off the bed and began resisting the deputies who were attempting to handcuff him. (Def. Ex. 1, Disk 3 of 4.) For King's part, he disputes that he was resisting and claims that he had his legs and arms crossed and was facing the wall stomach down, when Walker came in and grabbed him around the neck. (King Dep. (dkt. #53) at 109-10.)

While the court has reviewed that portion of the GoPro footage, it is hard to determine whether or not King actually pushed himself up off the bed when the deputies entered because he is blocked from view by the five deputies who rapidly descend on him. The GoPro footage does show, however, that King was prone just before defendants entered the cell, yet by 0:07 in the footage, with the deputies essentially on top of King, his body was no longer prone, and he had lifted his head and torso up as a bottom wrestler would starting in the referee's position. At least by that point, and likely before, King is also fairly successfully resisting the officers' efforts to get his hands behind his back.

What comes next on the GoPro footage is what might be described as a wrestling match between King and the five deputies that lasts from 0:04 until about 1:00, as King repeatedly attempts to get upright and is driven back down onto the bed on all fours. At that point, Deputy McNally entered the cell and pulled one of King's legs out from under him. This appears to allow the other five defendants to finally obtain physical control over

King. Although the parties dispute exactly what happened during that 56 seconds, it is clear that the defendants had employed varying degrees of force after Walker first made first contact with King.

As to the three seconds in which King's body is totally blocked from view on the video, Walker avers that in attempting to stabilize King's head by "placing both of [his] hands palms down around King's left ear in a diamond shape," he immediately felt resistance from King. According to King, it was actually Walker choking him to the point that he could "barely speak" that prompted him to attempt to roll on his side and fight Walker's hands away. (King Dep. (dkt. #53) at 110-11). Given that the GoPro audio establishes that King started yelling, in a clear voice, to come "get you some bitch" and other similar phrases taunting the officers starting at 0:09 of the footage (Def. Ex. 1, Disc 3 at 0:09-0:15), there is at most a factual dispute about what exactly occurred between the 0:04 and 0:09 mark of the tape. *See Scott v. Harris*, 550 U.S. 372, 378-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Regardless, when King broke free, defendant Walker can be seem delivering one strike with his left hand and two strikes with his knee to King's right side. Similarly, defendant Anderson straddled King's back and struck King's right side, but King threw his elbows at her and threw her off the bed. Defendant Bryant also attempted to hold down King's body at his torso but was pushed to the other side of the cell, while defendant Spears attempted to hold King down by pressing on his shoulders, but could not maintain that

8

position because King kept pushing upward.  Spears then struck King twice with a closed fist.  Finally, defendant Foltman can be seen being struck in the head by King, and then Foltman struck King five times.  While the parties dispute whether Foltman used an open or closed fist, a jury could reasonably find his fist was closed, although the blows seemed to have little or no effect.

At this point, King was able to lift himself to a kneeling position and push the deputies away.  King does not remember the exact details about who he was attacking or who delivered which blows; rather, he "was too busy counterattacking.  When [he] felt a punch come from, [he] was punching over there, wherever . . . ." (King Dep. (dkt. #53) at 121.)  Additionally, King does not dispute that when deputies yelled at him to put his hands behind his back, he retorted multiple times "put your hands behind your back bitch." (Def. Ex. 1, Disc 3 at 0:32-0:38.)  During his deposition, King also admits that he was "cracking everything around," and he punched a number of the deputies, including Deputy Foltman.  (King Dep. (dkt. #53) at 121-22.)

It was then that Deputy McNally, who was not part of the original extraction team, apparently saw that King was in a kneeling position and entered the cell to pull King's leg out from under him and pin his right ankle to the bed with his knee.  This caused King to lose his balance and fall to his stomach.  Once prone again, King told the deputies that he was no longer going to fight, and they were finally able to stabilize him.  From that point on, no further hand or knee strikes were administered.  (Def. Ex. 1, Disc 3 at 1:15-1:20.)  King was then handcuffed and placed in a Violent Prisoner Restraint Chair.  While he was being handcuffed, King could be heard yelling, "I ain't hurt."  Once King was in the

9

restraint chair, he also started loudly announcing that he had not been resisting. King further taunted the deputies, calling them "soft," cursing at them, and bragging about how many deputies it took to stabilize him. (*Id.* 3 at 3:58, 4:45-5:00.)

During his deposition, King went further stating:

> You know, I'm not going to lie, I was proud of myself, the way I protected myself. To have six, seven officers jumping on me at that time, you know, I was basically throwing it back in their face as if, hey, man, y'all did all of this and you're soft as hell in the whole situation.

(King Dep. (dkt. #53) at 124.) After King was moved out of the cellblock, officers were able to extract and transfer Coleman without incident.[5]

Although no obvious injuries could be seen on the video, King did receive medical attention. King also claims that he suffered from a sore ankle and bladder, as well as a seizure the next day, prompting a nurse to give him an injection to block the seizures. Even so, King admits that those injuries have resolved and are not permanent.

OPINION

I.   Fourteenth Amendment Excessive Force

As alluded to above, whether King was a pretrial detainee as of December 30, 2015, is unclear, but defendants have taken the position that he was. Accordingly, defendants have assumed that King's excessive force claims fall under the greater protections afforded him by the Fourteenth Amendment's due process clause. In particular, to prove his claim,

---

[5] Although not dispositive, a stark contrast exists between King's challenged extraction and Coleman's uneventful cell extraction, which was taped just minutes after King's, mainly because he agreed to lie on his bed with his arms held up behind him for handcuffing. (Def. Ex. 1, Disc 4.)

plaintiff must show "that the force purposely or knowingly used against him was objectively unreasonable," based on the following factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).[6]

As the Supreme Court explained in *Kingsley*, "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 2473 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Still, courts must consider "the perspective of a reasonable officer at the scene," and "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* Moreover, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

---

[6] Defendants also correctly point out that if King had been revoked as of December 30, 2015, his claim would fall under the Eighth Amendment's excessive force standard, which would be considerably more deferential to the defendants. Indeed, to succeed on an Eighth Amendment excessive force claim, King would need to prove that the prison official acted "wantonly or, stated another way, 'maliciously and sadistically for the very purpose of causing harm.'" *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). Regardless, since the court finds summary judgment is appropriate for defendants under the stricter Fourteenth Amendment objective reasonableness standard, it would also be appropriate if the Eighth Amendment's standard applied here.

11

situation." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (U.S. 1989).

Even viewing all of the circumstances facing defendants here in the light most favorable to King, a reasonable fact finder could not conclude that the defendants' use of force was objectively unreasonable. Indeed, the majority of those factors strongly militate in defendants' favor on the undisputed facts. To start, there is no reasonable dispute that King was actively resisting compliance with jail policy and directives from defendants throughout his interaction with the defendants, who reasonably perceived his numerous, persistent actions in violation of jail policy as a threat to jail safety and security. Indeed, King's disruption appears to have fed off of and compounded Coleman's disruption in the adjoining cell that involved a threat to jail staff.

What is more, defendants were certainly reasonable in interpreting King's threat as significant, especially after the defendants met and learned about King's earlier altercations with jail staff, which would have buttressed *any* reasonable officer's impression that King would not be transferred voluntarily. *See Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018) (emphasizing that the question of reasonableness depends on "the facts and circumstances before them and known to them at the time" of the incident). And King's continued taunting *before, during* and *after* the altercation suggests he felt entitled to fight, further confirming that King posed an ongoing, substantial threat to jail security.

While details of the injuries King suffered are in dispute, all description of his injuries were relatively minor and justified, as were seizures related to the OC spray that defendants first justifiably and judiciously employed to gain compliance without having to

resort to the cell extraction. First, none of the injuries were long-lasting. Indeed, there is no evidence that King feels any remaining effect from the incident, nor does any health care professional attribute a current health issue to that incident. Second, even King's principal, *initial* complaints concerned soreness to his ankle, which was almost certainly caused by officer McNally's objectively reasonable act in pulling King's leg out from under him at the height of his resistance and pinning his ankle to the bed to prevent his regaining a foothold. Third, even King's claimed pain from a few seconds of choking resulted in no claimed injury. Accordingly, while this factor is not dispositive, it also weighs against King or is neutral at most.

The remaining factors for consideration are the amount of force used, as well as whether defendants made any effort to limit the amount of force used. While these factors require more discussion, they also weigh in defendants' favor. To start, defendant Walker's use of the OC spray was completely reasonable given defendants' awareness of King's prior history, King's combative attitude at that time, the multiple opportunities he was given to comply with the officer's directives, and his purposeful, continued violation of jail policies, which was compounding the threat to jail safety and security that Coleman was already presenting. It was equally reasonable for the deputies to attempt to gain his compliance with the OC spray, rather than by entering his cell, since they all knew about King's history of conflict with jail staff and any cell extraction carries its own risk of injury to the inmate and guards struggling in such a small space.

Most importantly, the GoPro footage shows that Walker's administration of the spray was measured. Before spraying the OC, Walker specifically warned King that he

13

would be sprayed if he did not remove the mattress and step back from the front of his cell, to which King responded, "spray that shit." (Def. Ex. 1, Disc 1 at 0:04-0:10.) Even when Walker actually administered the spray, it was not continuous; the GoPro footage shows Walker spraying into King's cell in three short bursts at small openings between the mattress blocking the cell door, and then moving on to Coleman's cell. (*Id.* at 0:10-0:22.)

When the OC spray did not cause King to take down his mattress, it was likewise objectively reasonable for the officers to proceed with physical cell extraction using a team of officers. There is no dispute that defendants followed jail policy in terms of the number of deputies comprising the extraction team and the decision to extract him. While the GoPro footage shows that King attempted to provide an ongoing narration of the events, stating that the officers attacked him, at *no* point during the video footage of the cell extraction is King in full compliance with the deputies directives.[7] On the flip side, there is not a single instance during the extraction when one of the defendants laid a hand on him when he or she was not trying to either assert control over him, extract him or place him in the restraint chair.

To the contrary, King was actively inviting a continuation of the altercation, yelling obscenities, and then taunting defendants while they were trying to bring him under control, making comments like "put *your* hands behind *your* back bitch" and "get you some bitch." These undisputed facts suggest not only that defendants used reasonable force, but that they needed to employ *more* force to actually get him to comply. Under these

---

[7] The closest King ever came to complying was when it was clear that the full extraction team was about to enter his cell. At that point, King lay down, albeit in a position that would allow him to quickly resist if he chose to do so.

circumstances, no reasonable jury could find the officers liable. *See Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) ("Excessive-force claims are governed by the Fourth Amendment's 'reasonableness' standard, which turns on the totality of the circumstances confronting [the officers] viewed from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' and allowing for the fact that 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" (quoting *Graham*, 490 U.S. at 396–97)).

Up to this point, the court has considered the use of force by the defendants collectively, but liability necessarily turns on the actions of the individual defendants. *See Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires personal involvement in the alleged constitutional violations."). Given the video of the incident, King does not and cannot dispute that: (1) he essentially tossed Anderson off the bed; (2) King pushed Bryant to the other side of the cell; and (3) Spears was unable to hold King down, even when he struck him twice with a closed fist. Accordingly, judgment in favor of those three defendants is appropriate with no further discussion.

As to defendant Foltman, while King claims that he used a closed fist while attempting to strike him, the only reasonable conclusion in observing the GoPro footage of the incident is that Foltman was acting reasonably in response to King's continuing resistance. If anything, King was not only continuing to resist physically, but at that point in the altercation, King was actually gaining the upper hand and was only marginally

15

phased by the physical force that Foltman and the other four defendants were trying to bring to bear. Specifically, the GoPro footage shows that only after King had been able to knock Foltman (wearing helmet #11) off the bed, did Foltman regain his bearings and strike King several more times. (Def. Ex. 1, Disc 3 at 0:20-0:30.) Even then, Foltman's strikes appear to have little impact, since King was able to continue resisting, momentarily pushing the deputies completely off of him. (*Id.* at 0:35-0:45.) As such, Foltman's strikes, even with a closed fist, were a reasonable response to the significant and continued threat plaintiff posed.

As for defendant McNally, King makes no real effort to argue that his very limited involvement was unreasonable. McNally did not even step into the cell until he saw that plaintiff had risen up on the bunk to a kneeling position and had successfully fended off Anderson, Bryant and Spears. At that point, McNally pressed down on plaintiff's ankle in an effort to restrain him. Moreover, his body language in the GoPro footage appeared calm, and he made no other contact with King. By all accounts, and as confirmed by the video, McNally acted reasonably to ensure that the deputies could get and keep King under control.

That leaves defendant Walker, who was the first to enter King's cell, with four other officers pressing forward in a tight line direction behind him. King's opposition brief focuses primarily on his assertion that: (1) he was in compliance when the deputies entered; and (2) only when Walker choked him, did he fight back. To the contrary, the GoPro footage shows that while King may have been lying down before the extraction team entered his cell, he was not on his back, he was positioned in a way that would permit him

16

to immediately resist, and he appeared to do so almost immediately. Furthermore, the GoPro footage shows that Walker never gained physical control over King for *any* material period of time after he entered the cell. (*See* Def. Ex. 1, Disc 3 at 0:03-0:07.) Rather, it shows that Walker entered the cell and jumped on King about 0:04 with four others piling in behind; and by 0:09, King had already successfully pushed Walker away from him, no small feat given that Walker appeared of a similar height and build to King.

Even assuming that Walker grabbed him by the neck for those few seconds, a reasonable fact finder could not conclude that the amount of force Walker used was an unreasonable response to the threat King posed before, in the moments leading up to, and during the cell extraction. Indeed, even crediting King's dubious version of these few seconds, a jury would have to speculate that Walker's immediate actions were objectively unreasonable given the leeway an officer is allowed in trying to bring an inmate under control under such challenging conditions.

Finally, while King's position is that Walker choked him so severely at 0:04 that he could hardly speak, the footage shows that from 0:09 until about 1:00, King goaded the deputies nonstop, yelling, among other things: "come on bitch," "yeah bitch" and "everybody get some." (*Id.* at 0:09-1:00.) Moreover, the tone and volume of his voice remained strong and did not even suggest that he was struggling to breath. Not coincidentally, this was consistent with the defiant tone he had been taking with the officers for at least the previous 15 minutes. Given King's physical strength, history of violence, and ongoing resistance, a reasonable factfinder could not conclude that the amount of force Walker used in attempting to gain control over King by grabbing his neck

17

for, at most, a few seconds, went too far.  If anything, should this GoPro video *still* require a trial, one might reasonably ask whether videotaping of extractions will ever help eliminate factual disputes requiring a trial.  Accordingly, judgment will be entered in favor of all of defendants.[8]

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #45) is GRANTED.

2) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 14th day of February, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[8] Defendants also sought summary judgment on the basis of qualified immunity.  Because the court finds that no reasonable jury could find the defendants' use of force was objectively unreasonable, the court need not consider whether the law was clearly established at the time of the December 30, 2015, incident.